## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC | Case No. |
| | Hon. |
| *Plaintiff*, | |
| v. | **JURY TRIAL DEMANDED** |
| PRESTIGE HOME LOANS LLC, AND JUNIOR BEAUBRUN | |
| *Defendants*. | |

### <u>COMPLAINT</u>

Plaintiff United Wholesale Mortgage, LLC ("UWM"), submits the following Complaint against Defendant Junior Beaubrun ("Beaubrun") and Defendant Prestige Home Loans LLC ("Prestige") jointly, ("Defendants"):

### INTRODUCTION

1.     UWM is a wholesale mortgage lender based in Pontiac, Michigan. It originates residential mortgage loans through independent mortgage brokers and non-delegated correspondent lenders ("Brokerage Partners").

2.     Prestige, one of UWM's Brokerage Partners, works directly with borrowers to submit loans to UWM.

3.     Prestige is a party to the Wholesale Broker Agreement (the "Agreement") with UWM. See Exhibit A, Wholesale Broker Agreement.

-1-

4.      Beaubrun is a licensed mortgage loan originator, who is an employee of and principal manager for Prestige.

5.      This action arises from Prestige's submission, through Beaubrun, of materially false and misleading residential mortgage loan applications (the "Loan Applications") to UWM for the following mortgage-loans (jointly, "the Loans"):

     a.  XXXXXXXX73[1] on the property located in Punta Gorda, Florida ("Loan 1"). See Exhibit B, Loan File 1 Excerpts at 1–2.

     b.  XXXXXXXX66 on the property located in Tamarac, Florida ("Loan 2"). See Exhibit C, Loan File 2 Excerpts at 3.

     c.  XXXXXXXX80 on the property located in Boynton Beach, Florida ("Loan 3"). See Exhibit D, Loan File 3 Excerpts at 1.

6.      UWM relied on the misrepresentations when it decided to approve and fund the Loans, which UWM later sold to Fannie Mae. During a routine audit, Fannie Mae determined that the Loan Applications contained false information and that the Borrowers would not have otherwise been approved for the Loans. As a result, the Loans did not meet the requirements of Fannie Mae's Selling Guide. See generally *Fannie Mae Selling Guide* (May 28, 2025), https://selling-guide.fanniemae.com/.

7.      Consequently, Fannie Mae required UWM to repurchase the Loans, causing UWM significant economic harm because UWM can only resell the Loans

---

[1] The first eight digits of all loan numbers have been redacted for the privacy of the borrower(s).

to a different investor on the "scratch-and-dent" mortgage market at a significant loss. See Exhibit E, *Fannie Mae Selling Guide*, A2-3.2-01; Exhibit F, Letter from Fannie Mae re: Notice of Loan 1 Defect; Exhibit G, Letter from Fannie Mae re: Notice of Loan 2 Defect; and Exhibit H, Letter from Fannie Mae re: Notice of Loan 3 Defect.

8.     UWM brings this action to recover over $309,000 in damages it suffered because of Prestige's breach of contract, Beaubrun's fraudulent misrepresentation, and, in the alternative, negligent misrepresentations by both Defendants.

### PARTIES

9.     UWM is a Michigan limited liability company with its principal place of business at 585 South Boulevard East, Pontiac, Michigan 48341. UWM's sole member is UWM Holdings, LLC, which is comprised of two members, SFS Holding Corp. and UWM Holdings Corporation. SFS Holding Corp. is incorporated in Michigan and has its principal place of business at 585 South Boulevard East, Pontiac, Michigan 48341. UWM Holdings Corporation is incorporated in Delaware and has its principal place of business at 585 South Boulevard East, Pontiac, Michigan 48341.

10.     Defendant Prestige is a Florida Corporation that transacts business in Oakland County, Michigan, including by entering into and performing the Wholesale Broker Agreement with UWM.

11.     Defendant Beaubrun is an individual who resides in Sarasota, Florida, and who transacts business in Oakland County, Michigan, including by submitting loan applications to UWM.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because this Complaint states an action that is between citizens of different states and, as set out below, involves an amount in controversy that exceeds $75,000, exclusive of interest and costs.

13.     This Court has jurisdiction over Prestige because Prestige has established minimum contacts with the state of Michigan by, among other things, entering into a contract with UWM, a Michigan company, and conducting business in this District. In addition, Prestige expressly agreed in its Wholesale Broker Agreement with UWM to submit to the exclusive jurisdiction of courts located in this District and waived any objection to personal jurisdiction. See Exhibit A at ¶ 7.15.

14.     This Court has personal jurisdiction over Beaubrun because, among other things, he knowingly submitted fraudulent loan applications to UWM in

Michigan, thereby purposefully availing himself of the privilege of conducting business in this forum.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to UWM's claims occurred in this District. Further, in the Wholesale Broker Agreement, the parties agreed that they would submit any action arising out of the Agreement to this Court in this District. *See id.*

## FACTUAL BACKGROUND

### A.     UWM's Loan Process.

16.     Unlike retail lenders, UWM does not interact directly with a mortgage borrower until after the loan is closed. Rather, UWM relies on a vast network of independent mortgage brokers ("Brokerage Partners"), who work directly with borrowers, to submit loan applications to UWM.

17.     After a Brokerage Partner submits a loan application to UWM for underwriting, if the loan meets UWM's applicable guidelines, UWM purchases and funds the loan.

18.     UWM then sells the loan to an investor, which is most often the Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation ("Freddie Mac").

19.     Fannie Mae and Freddie Mac have pre-established guidelines for acquiring loans from UWM which are reflected in their respective, but substantially similar, Selling Guides. See generally *Fannie Mae Selling Guide* (May 28, 2025), https://selling-guide.fanniemae.com/.

20.     Accordingly, UWM requires that a loan submitted to it by a Brokerage Partner meets the requirements the applicable Selling Guide before UWM funds the loan.

21.     Fannie Mae's Selling Guide includes income, credit, occupancy, and debt-related requirements, among other factors. *Id.*

22.     After UWM sells a loan to Fannie Mae, Fannie Mae, as part of its quality-control and post-purchase review procedures, conducts periodic audits of loans it has purchased or securitized. These audits are designed to verify that the loans meet Fannie Mae's underwriting guidelines and eligibility requirements reflected in the Fannie Mae Selling Guide. *Id.* If, during an audit, Fannie Mae determines that a purchased loan contains defects or potential misrepresentations, it may issue a repurchase demand to UWM.

**C.     The Wholesale Broker Agreement.**

23.     Prestige is an independent mortgage loan brokerage and is one of UWM's Brokerage Partners. See Exhibit A.

24.     Beaubrun is a broker and Principal Manger for Prestige.

25.     In 2017, Prestige entered into the Agreement with UWM. *Id.*

26.     Under the Agreement, Prestige agreed to ensure that "each Mortgage Loan [Prestige] submitted to UWM for underwriting, purchase, and/or funding [was] true, complete and correct in all material respects as of the date of such submission." *Id.* at ¶ 3.03.

### D.     The Fraudulent Loans.

### i. Loan 1 (XXXXXXXX73)

27.     On August 9, 2022, UWM closed on loan number XXXXXXXX73 ("Loan 1") in the amount of $532,000. See Exhibit B; Exhibit F, Loan 1 Initial Resolution Request Letter.

28.     Beaubrun gathered, reviewed, and organized the Borrower's financial information and Loan 1 Application and submitted Loan 1 to UWM on behalf of Prestige.

29.     Based on the information Prestige and Beaubrun submitted to UWM in connection with the Loan 1 Application, UWM issued a commitment and underwrote, purchased, and funded Loan 1. See generally Exhibit B.

30.     UWM then sold Loan 1 to Fannie Mae on August 24, 2022. See Exhibit F.

31.     After UWM sold Loan 1 to Fannie Mae, Fannie Mae audited Loan 1. As part of its audit, Fannie Mae compared Loan 1 to other loans submitted to Fannie

Mae from other lenders for the same Borrower and found discrepancies in the Loan 1 Application, including income misrepresentation. See *Id.*

32. The income misrepresentation involved false statements inflating the Borrower's actual income. *Id.* Specifically, the Borrower submitted paystubs and W-2s in connection with Loan 1 that were inconsistent with tax transcripts, third-party records, and income documentation submitted to Fannie Mae in connection with other loans. E.g. while Loan 1 reflected W-2 employment and a fixed monthly salary, other loan documents and verified records submitted to Fannie Mae indicated the Borrower was self-employed. The other loan documents also included a purported lease for the departing property that used the same tenant phone number as the lease for the subject property, suggesting the leases were fabricated. *Id.*

33. On July 25, 2024, Fannie Mae therefore demanded the repurchase of Loan 1. *Id.*

34. Upon receiving Fannie Mae's repurchase demand, UWM also conducted its own internal review of Loan 1 and the Loan 1 Application.

35. During its review, UWM found that the broker had multiple instances of similar misrepresentation matching this pattern and confirmed that the assets were misrepresented and the fabrication of income documentation. UWM concluded that Defendants altered the Borrower's information in the Loan 1 Application.

36. UWM therefore confirmed Fannie Mae's findings.

37.     But for the misrepresented information, the Borrower would not have qualified for the loan that they were given.

38.     UWM is legally obligated to repurchase any loan that violates Fannie Mae's representations and warranties, including in cases where borrower or third-party fraud caused a borrower to receive a loan for which they did not qualify. See Exhibit E, Section A2-3.2-01.

39.     Upon Fannie Mae's repurchase demand, UWM was contractually obligated to pay Fannie Mae the full outstanding balance of Loan 1 and absorb the resulting financial losses. The original principal amount of the loan was $532,000.

40.     UWM's repurchase obligation, triggered by Defendants' material misrepresentations in connection with the Loan 1 Application, resulted in an actual financial loss to UWM. Upon UWM's repurchase, due to the identified defects, including material misrepresentations, Loan 1 became ineligible for resale to Fannie Mae, Freddie Mac, or any other government-sponsored enterprise, or government-backed program. UWM was therefore forced to sell Loan 1 on the secondary "scratch-and-dent" market, where only distressed asset investors and nonbank servicers purchase defective loans at a significant discount.

41.     Accordingly, UWM's repurchase of Loan 1 and subsequent resale on the scratch-and-dent market, resulted in a total loss of $79,900.00 to UWM. This loss reflects the difference between the amount of the unpaid principal balance on

the loan when UWM sold the loan on the scratch-and-dent market and the sale price of Loan 1 on the scratch-and-dent market with the discovered defects.

**ii. Loan 2 (XXXXXXXX66)**

42.   On June 2, 2021, UWM closed on loan number XXXXXXXX66 ("Loan 2") in the amount of $531,000. See Exhibit C Loan 2 File Excerpts; See Exhibit G, Loan 2 Initial Resolution Request Letter.

43.   Beaubrun gathered, reviewed, and organized the Borrower's financial information and Loan 2 Application and submitted Loan 2 to UWM on behalf of Prestige.

44.   Based on the information Prestige and Beaubrun submitted to UWM in connection with the Loan 2 Application, UWM issued a commitment, underwrote, purchased, and funded Loan 2. See generally Exhibit C.

45.   UWM then sold Loan 2 to Fannie Mae on June 29, 2021. See Exhibit G.

46.   After UWM sold Loan 2 to Fannie Mae, Fannie Mae audited Loan 2. As part of its audit, Fannie Mae compared Loan 2 to other loans submitted to Fannie Mae for the same Borrower and found discrepancies in the Loan 2 Application, including income misrepresentation and asset misrepresentation. See *id*.

a.   The income misrepresentation involved false statements inflating the Borrower's actual income. *Id.* Specifically, the Borrower

submitted W-2s and bank statements in connection with Loan 2 that were inconsistent with verified information obtained from Wells Fargo and the lender self-report. The 2020 W-2 appears fabricated, as it reflects Social Security wages in Box 3 above the statutory limit, and the employer address for "Carriage Auto Transport" corresponds to a residential property. While the Wells Fargo bank statement reflected direct deposits from Carriage Auto Transport, Wells Fargo confirmed that the statements provided were not factual.

b. The asset misrepresentation involved false statements inflating the Borrower's available assets. *Id.* Specifically, the Borrower submitted Wells Fargo bank statements in connection with Loan 2 that were inconsistent with information obtained directly from Wells Fargo and identified as fabricated in the lender self-report. The Wells Fargo documentation provided was confirmed to be not factual and could not support the claimed asset balances. *Id.*

47.     On July 29, 2024, Fannie Mae therefore demanded the repurchase of Loan 2. *Id.*

48.     Upon receiving Fannie Mae's repurchase demand, UWM also conducted its own internal review of Loan 2 and the Loan 2 Application.

49.     During its review, UWM obtained copies of the documentation submitted in relation to Loan 2, including W-2s and bank statements. UWM found that the borrower's alleged employer's address was a residential address and confirmed with Wells Fargo that the bank statements were fraudulent.

50.     UWM therefore confirmed Fannie Mae's findings.

51.     But for the misrepresented information, the Borrower would not have qualified for the loan that they were given.

52.     UWM is legally obligated to repurchase any loan that violates Fannie Mae's representations and warranties, including in cases where borrower or third-party fraud caused a borrower to receive a loan for which they did not qualify. See Exhibit E, Section A2-3.2-01.

53.     Upon Fannie Mae's repurchase demand, UWM was contractually obligated to pay Fannie Mae the full outstanding balance of Loan 2 and absorb the resulting financial losses. The original principal amount of the loan was $531,000.

54.     UWM's repurchase obligation, triggered by Defendants' material misrepresentations in connection with the Loan 2 Application, resulted in an actual financial loss to UWM. Upon UWM's repurchase, due to the identified defects, including material misrepresentations, Loan 2 became ineligible for resale to Fannie Mae, Freddie Mac, or any other government-sponsored enterprise, or government-backed program. UWM was therefore forced to sell Loan 2 on the secondary

"scratch-and-dent" market, where only distressed asset investors and nonbank servicers purchase defective loans at a significant discount.

55.     Accordingly, UWM's repurchase of Loan 2 and subsequent resale on the scratch-and-dent market resulted in a total loss of $149,560.92 to UWM. This loss reflects the difference between the amount of the unpaid principal balance on the loan when UWM sold the loan on the scratch-and-dent market and the sale price of Loan 2 on the scratch-and-dent market with the discovered defects.

### iii. Loan 3 (XXXXXXXX80)

56.     On July 22, 2022, UWM closed on loan number XXXXXXXX80 ("Loan 3") in the amount of $517,750. See Exhibit D Loan 3 File Excerpts; See Exhibit H, Loan 3 Initial Resolution Request Letter.

57.     Beaubrun gathered, reviewed, and organized the Borrower's financial information and Loan 3 Application and submitted Loan 3 to UWM on behalf of Prestige.

58.     Based on the information Prestige and Beaubrun submitted to UWM in connection with the Loan 3 Application, UWM issued a commitment and underwrote, purchased, and funded Loan 3. See generally Exhibit D.

59.     UWM then sold Loan 3 to Fannie Mae on August 9, 2022. See Exhibit H.

60. After UWM sold Loan 3 to Fannie Mae, Fannie Mae audited Loan 3. As part of its audit, Fannie Mae compared Loan 3 to other loans submitted to Fannie Mae for the same Borrower and found discrepancies in the Loan 3 Application, including asset misrepresentation. See *id.*

61. The asset misrepresentation involved false statements inflating the borrower's available assets. *Id.* Specifically, the Borrower submitted Bank of America account documentation in connection with Loan 3 that was inconsistent with verified information. A reverification of assets conducted after Loan 3 closed on July 22, 2022, revealed that Bank of America was unable to verify the account records. Bank of America confirmed that the statements provided—purporting to show ending balances as of May 25, 2022, and April 25, 2022—were not located in its system of records. *Id.* Based on these misrepresentations, National Mortgage Insurance Corporation determined that a severe error had occurred in the origination of the subject loan and rescinded the 30% private Mortgage Insurance coverage that was required for Loan 3's 95% loan-to-value ratio. *Id.*

62. On June 17, 2024, Fannie Mae therefore demanded the repurchase of Loan 3. *Id.*

63. Upon receiving Fannie Mae's repurchase demand, UWM also conducted its own internal review of Loan 3 and the Loan 3 Application.

64. During its review, UWM confirmed the misrepresentation and noted

that the broker had been banned for multiple cases of misrepresentation.

65.    UWM therefore confirmed Fannie Mae's findings.

66.    But for the misrepresented information, the Borrower would not have qualified for the loan that they were given.

67.    UWM is legally obligated to repurchase any loan that violates Fannie Mae's representations and warranties, including in cases where borrower or third-party fraud caused a borrower to receive a loan for which they did not qualify. See Exhibit E.

68.    Upon Fannie Mae's repurchase demand, UWM was contractually obligated to pay Fannie Mae the full outstanding balance of Loan 3 and absorb the resulting financial losses. The original principal amount of Loan 3 was $517,750.

69.    UWM's repurchase obligation, triggered by Defendants' material misrepresentations in connection with the Loan 3 Application, resulted in an actual financial loss to UWM. Upon UWM's repurchase, due to the identified defects, including material misrepresentations, Loan 3 became ineligible for resale to Fannie Mae, Freddie Mac, or any other government-sponsored enterprise, or government-backed program. UWM was therefore forced to sell Loan 3 on the secondary "scratch-and-dent" market, where only distressed asset investors and nonbank servicers purchase defective loans at a significant discount.

70. Accordingly, UWM's repurchase of Loan 3 and subsequent resale on the scratch-and-dent market, resulted in a total loss of $104,331.48 to UWM**.** This loss reflects the difference between the amount of the unpaid principal balance on the loan when UWM sold the loan on the scratch-and-dent market and the sale price of Loan 3 on the scratch-and-dent market with the discovered defects.

## COUNT I – BREACH OF CONTRACT (PRESTIGE)

71. UWM re-alleges and incorporates the foregoing Paragraphs 1–70 as if fully restated.

72. The Agreement is a valid contract between Prestige and UWM.

73. Under the Agreement, for each mortgage loan Prestige submitted to UWM, Prestige was contractually obligated to provide documents and information that were "true, correct, currently valid, and genuine in all material respects, as to all information within Broker's knowledge and as reported by each applicant[.]" Exhibit A, at ¶ 3.03.

74. Under the Agreement, UWM agreed, "[u]pon the issuance of a commitment in UWM's name to the Borrower, UWM shall generally proceed with Closing of the Mortgage Loan in accordance with the terms and conditions set forth in the commitment to the Borrower[.]" *Id.* at ¶ 3.02.

75. Unbeknownst to UWM, Prestige included incorrect and false information and made material misrepresentations in connection with submitting the

Loans to UWM, knowing that the Loan Applications contained information that was not "true, correct, currently valid, and genuine in all material respects, as to all information within Broker's knowledge and as reported by each applicant[.]" Exhibit A at ¶ 3.03.

76.     In reliance on Prestige's representations in the Loan Applications, UWM issued a commitment to the Borrower to proceed with closing the Loans. See generally Exhibits B-D.

77.     On August 9, 2022, in reliance on the incorrect and false information Prestige included in the Loan 1 Application, UWM closed on Loan 1 in the amount of $532,000.00. Exhibit B at pp. 1–2; Exhibit F.

78.     On June 2, 2021, in reliance on the incorrect and false information Prestige Included in the Loan 2 Application, UWM closed on Loan 2 in the amount of $532,000.00. See Exhibit C at 8; Exhibit G.

79.     On July 22, 2022, in reliance on the incorrect and false information Prestige included in the Loan 3 Application, UWM closed on Loan 3 in the amount of $517,750.00. See Exhibit D at 2; Exhibit H.

80.     Post-closing audits of the Loans by Fannie Mae and review by UWM revealed Prestige had misleadingly altered material information regarding the Borrowers that was included in the Loan Applications. See Exhibits F–H.

81.     The misleading material information included misrepresentation of the

Borrowers' incomes to make them appear higher than they actually were.

82.     The misleading altered information was material to UWM's decision to close on the Loans and to Fannie Mae's subsequent purchase of the Loans from UWM.   Had UWM known the Loan Applications contained the false, altered information, it would not have closed on the Loans or sold them to Fannie Mae.

83.     As a result of Prestige's breach of the Agreement, including but not limited to ¶ 3.03, UWM was forced to repurchase the Loans at a loss and has suffered damages in the amount of at least $309,245.65

WHEREFORE, UWM requests that this Honorable Court: (a) enter judgment in its favor and against Prestige awarding UWM damages against Prestige, plus reasonable attorneys' fees; and (b) award any other relief this Court deems just and proper.

## COUNT II - FRAUDULENT MISREPRESENTATION (BEAUBRUN)

84.     UWM re-alleges and incorporates the foregoing Paragraphs 1–83 as if fully restated.

85.     Beaubrun, as the mortgage broker for the Loan, intentionally made or caused to be made false representations in connection with the Loan Applications submitted to UWM, including by misrepresenting the Borrowers' incomes as higher than they actually were.

86.     Beaubrun knew the representations he made regarding the Loan Applications were false when they were made.

87.     Beaubrun knew or should have known that if he disclosed the Borrowers' true incomes the Borrowers would not have been eligible to obtain the Loans from UWM.

88.     Beaubrun made the false representations regarding the Loan Applications, or caused them to be made, with the intention that UWM would rely on the false representations.

89.     UWM acted in reliance upon the false representations of Beaubrun regarding the Loans and Loan Applications by, among other things, purchasing and funding the Loans.

90.     If UWM had known of the Borrowers' true incomes it would not have approved the Loans to the Borrowers, nor would it have purchased or funded the Loans.

91.     Beaubrun's conduct in knowingly misstating the Borrowers' incomes constitutes false misrepresentations of material facts.

92.     Due to the misrepresentations, since the Borrowers would no longer qualify for the loan they were given, under the requirements of the Fannie Mae Selling Guide (See generally Exhibit E) the Loans were no longer eligible for purchase by Fannie Mae, forcing UWM to repurchase the Loans from Fannie Mae.

93.     Following UWM's repurchase of the Loans, UWM was forced to resell the Loans on the secondary scratch-and-dent market at a steep discount.

94.     Due to Beaubrun's fraudulent misrepresentations, UWM has suffered substantial economic damages of $309,245.65, plus its attorneys' fees and costs.

WHEREFORE, UWM requests that this Honorable Court: (a) enter judgment in its favor and against Beaubrun awarding UWM damages against Beaubrun, plus reasonable attorneys' fees; and (b) award any other relief this Court deems just and proper.

## COUNT III – FRAUDULENT MISREPRESENTATION (PRESTIGE)

95.     UWM re-alleges and incorporates the foregoing Paragraphs 1–94 as if fully restated.

96.     This Count is pled in the alternative to Count I, in the event the Court finds that no enforceable contract governs Prestige's conduct, or that the conduct at issue was outside the scope of the Agreement.

97.     Prestige, through its employee and principal Beaubrun, knowingly submitted false information to UWM in connection with the Loan Applications including inflated income figures.

98.     Prestige made these material misrepresentations with knowledge of their falsity and with the intent that UWM rely on the misrepresentations when evaluating whether to approve and fund the Loans.

99.    UWM reasonably relied on the false information submitted by Prestige when it underwrote, approved, and funded the Loans.

100.   As a direct and proximate result of Prestige's fraudulent misrepresentations, UWM was required to repurchase the Loans from Fannie Mae.

101.   Following UWM's repurchase of the Loans, UWM was forced to resell the Loans on the secondary scratch-and-dent mortgage-loan market at a steep discount and suffer at least $309,245.65 in damages.

WHEREFORE, UWM requests that this Honorable Court: (a) enter judgment in its favor and against Prestige awarding UWM damages against Prestige, plus reasonable attorneys' fees; and (b) award any other relief this Court deems just and proper.

## COUNT IV – NEGLIGENT MISREPRESENTATION (BEAUBRUN AND PRESTIGE)

102.   UWM re-alleges and incorporates the foregoing Paragraphs 1–101 as if fully restated.

103.   This Count is pled in the alternative to Count II in the event the Court finds that Beaubrun did not act with intent to defraud but nevertheless failed to exercise reasonable care in connection with the information submitted in the Loan Applications.

104.   Prestige, acting as a wholesale mortgage broker, owed UWM a duty to ensure that all information it submitted in connection with the Loan Applications was true, accurate, and complete.

105.   Beaubrun, acting as a licensed broker and agent of Prestige, owed UWM a duty of reasonable care in verifying and submitting borrower information in connection with the Loan Applications.

106.   Prestige and Beaubrun made false representations to UWM regarding the Loan Applications, including but not limited to inflated income figures for the Borrowers.

107.   Prestige and Beaubrun breached their respective duties to UWM by failing to exercise reasonable care in verifying the accuracy of the information contained in the Loan Applications before submitting them to UWM.

108.   At the time Prestige and Beaubrun submitted the Loan Applications to UWM, they knew or should have known that the information they provided was false or materially misleading.

109.   UWM reasonably and justifiably relied on the information provided by Prestige and Beaubrun in approving and funding the Loans, and in selling the Loans to Fannie Mae.

110.   Had UWM known the true facts, it would not have approved or funded the Loans, nor would it have sold the Loans to Fannie Mae.

111.   As a result of the false representations made by Prestige and Beaubrun, UWM was required to repurchase the Loans from Fannie Mae and resell them on the scratch-and-dent market at a steep discount.

112.   UWM has been and continues to be damaged as a direct and proximate result of the false representations made by Prestige and Beaubrun, in an amount of at least $309,245.65, exclusive of interest, costs, and attorneys' fees.

## PRAYER FOR RELIEF

113.   UWM respectfully requests that the Court enter a judgment in its favor against Defendants, jointly and severally, and award the following relief:

    a.   Compensatory damages in the amount of at least $309,245.65;

    b.   Other compensatory damages relating to the breach;

    c.   Attorney fees, costs, and other expenses UWM incurred in this action;

    d.   Pre- and post-judgment interest;

    e.   Such other and further relief as the Court may deem just and proper.

WHEREFORE, UWM requests that this Honorable Court: (a) enter judgment in its favor and against Beaubrun and Prestige awarding UWM damages against Beaubrun and Prestige, plus reasonable attorneys' fees; and (b) award any other relief this Court deems just and proper.

## **<u>JURY DEMAND</u>**

UWM respectfully demands a trial by jury on all issues triable by jury.


Dated: November 17, 2025                    Respectfully submitted,

                                                      By: */s/ Moheeb H. Murray*
                                                    Moheeb H. Murray (P63893)
                                                    William E. McDonald, III (P76709)
                                                    Alexandra Hathaway Tillman (P87532)
                                                    100 W. Big Beaver Road, Suite 400
                                                    Troy, MI 48084
                                                    (248) 822-7800
                                                    murray@bsplaw.com
                                                    mcdonald@bsplaw.com
                                                    tillman@bsplaw.com

                                                    *Attorneys for Plaintiff*
                                                    *United Wholesale Mortgage, LLC*